Good morning, ladies and gentlemen. Our first case for this morning is Bisluk v. Hamer. Mr. Baker. Good morning. May it please the Court, I'm appearing this morning on behalf of Teresa Bisluk. At times relevant to this case, Ms. Bisluk was a special agent for the Illinois Liquor Control Commission, and the incident giving rise to the case in the district court was her inability to secure a transfer from her post of duty in the Chicago area to a new post of duty in central Illinois. For purposes of this appeal, there are two defendants that Ms. Bisluk is focusing upon. One is Pat Welch, the assistant director of the Department of Revenue, and the other is Lanny Krosel, who is the department's chief of staff. So, you're focusing on this transfer, and I guess I have a couple of problems maybe you can help me with. The first is it looks like she didn't really complete the application process on one occasion at least, and so how can that be something that they're responsible for not giving her? There was a, I think a misperception by the district court that was harbored by the defendants in this appeal that the only way Ms. Bisluk could secure a transfer was to apply for the southern Illinois position and go through the competitive process. But what evidence is there that other people are getting transfers without applying? Well, we have one specifically, George Gottlieb. Do we know that he didn't apply and that he was otherwise in every way similarly situated? He indicated that at one point in time he sought a transfer to a new territory to coincide with moving his residence to a different area, and I believe in his declaration he indicated he did not have to go through any type of hiring process. He simply requested a transfer. It's interesting. I'm not sure that that fully answers my question because, you know, it seems to me the department is entirely entitled to ask for, you know, a paper record. I'm not sure that they would have been rehiring Ms. Bisluk either if she had applied, but it was moving from one type of agent position to another, agent one, agent two. Our point, Judge, is that it didn't have to be an agent two position. But it was an agent two position. I mean, I would have thought it was fishier if it had been agent one and they changed it to agent two just to say that she didn't qualify, but it had always been a two. And didn't they want to have at least one agent two in that area? There weren't any others? What Mr. Welch said during the arbitration proceeding was that he did not want to have a disproportionate number of agent twos in any one territory, and that's why he posted it as an agent two. The fallacy with what he said is that at that time in Cook County and all of the countercallers of Cook County, there was only one agent two. So if you're really seeking geographic balance in the disbursement of agent twos, the logical thing would have been to... Well, I didn't think it was geographical balance. I just thought they wanted in this area to have one, in this southern Illinois area, to have, somewhat southern, to have one agent two, at least one. That's what he said. Well, why wouldn't that make sense since they are, they have, you know, supervisory responsibilities that... Well, a couple of points. As a practical matter, in day-in, day-out assignment of duties, an agent one does precisely the same thing as an agent two. But the record doesn't really show, I mean, you stress this, but we normally let employers define jobs as they wish, and there was a component of the agent two's responsibility that was different. Why bother to have the two job classifications at all? You're essentially saying that's just a smokescreen. What I'm saying is that if agent twos had, in reality, done the duties that were ascribed to them on the position description, that would be one thing. If the department had not interchangeably moved agent ones into territories formerly done by agent twos, that would be another thing. But the reality here is the way the department operated, they would assign agent ones to territories that had formerly been assigned to agent twos and vice versa. The other... Could I ask you, I mean, you give examples where you say that happened, but what I couldn't tell from your brief, whether this was an account of all transfers or whether we're just looking at a numerator without knowing what the denominator is, I mean, there must have been some... Well, I don't know. I mean, is this every transfer or is this just a few examples? No, I'm not suggesting it was every transfer. So sometimes they transfer a one to a one or a two to a two. Sure, sure. But no information about how often that happened. No, the point we were making is that it was not an infrequent occurrence. But see, that's why I don't know. If I see that there are five examples and you tell me it's not infrequent, is that five out of ten or is it five out of a hundred? How am I to understand this concept of frequency? And unfortunately, there's nothing in the record that identifies the number of times an agent two position became vacant and filled. So could I ask you another question? Sure. Before I lose the thought, I'm concerned on the question whether a lateral transfer, such as the one that she was seeking, is even an adverse employment action. What does she lose by being in need, other than the fact that she decided she wanted to buy the vineyard, but what does she lose? Well, in the context of this situation, she essentially was working in one part of the state and living in another. That's her fault. I mean, she sold her Chicago property and decided to buy property elsewhere, which she's certainly entitled to do and maybe have a little apartment in Chicago or whatever she did. But I don't see why that's a sign that the department did something wrong. What we're saying is, in the context of her situation, she was living in one part of the state and working in another. But not at the beginning. She decides that she's going to sell her Chicago property. That's correct. She did. I just don't get that. And let me just ask you something about Welch's and Krosel's authority. Did personnel have to come to either one of them to get authorization to deny her request, her transfer request? No. They didn't. And that's, I think, a significant point in this case because the defendants are essentially saying that there was a competitive hiring process for Ms. Bisley to become an agent too, and they really had no involvement in that process. And that's true. But it's our position that it could have been posted as an Agent 1. That had been done in the past. There was logic in posting it as an Agent 1. And the reason for not posting it as Agent 1 is suspect. And the person that- And how do you tie that to either one of them, Welch or Krosel? I'm sorry, I didn't hear- How do you tie Welch or Krosel to that theory that you have? Krosel was kind of the middle person. She was the coordinator between the governor's office and filling positions. And Mr. Welch, and primarily we believe Mr. Welch is the most culpable because he's the one that, on the record, harbored an animus for Bisley. He tied it to her political background. And he's the one that made the decision that it would be an Agent 2 position rather than If you want to save a little time, did you have any other questions? No. Do you want to save a little time for rebuttal? Thank you. I would. Ms. Welch? Good morning, Your Honors. May it please the Court, I'm Mary Welch. I'm here on behalf of the defendants, Krosel and Welch. Let me address what Plaintiff's Counsel just said. In fact, there is no evidence that Welch knew that Plaintiff wanted to transfer before he filled out the critical vacancy form on March 15th. And in fact, a week earlier, Secretary Hamer had approved the vacancy, had approved the position as a 2. So in fact, it was, both of the implications are wrong. Welch did not- And that was a decision to continue it as a 2, right? Correct. Correct. Correct. To continue it as a 2. And that was Secretary Hamer, and that was before Welch initiated the critical vacancy request form, which was the, you know, the logical consequence of saying yes, we've decided we have enough money, we have, we still wanted to, because as both the Director Hamer's approval for the position said, and also the critical vacancy request form said, there was only one supervisor, only one 2 in that territory, and if you have only 2 and you had 22 1s, you need a 2. You need a supervisor for those 22 people. Now, as of the time Hamer approves it as a 2, does the record indicate that Welch knew of Bisloch's political loyalties? I mean, I thought there was some indication that she'd been trying to talk to him and say, you know, hey, I have an interest in moving even before that. There is an indication, well, for those 2 points, there is an indication in the record that she had tried to contact him. There's no indication in plaintiff points to no evidence in the record to show that he knew why she was trying to, or that she was even trying, you know, that he did. He knew that she was trying, yeah. That he knew that she was trying to contact him, or what she was trying to contact him about. Now, also, there is evidence in the record that in October of 07, which is 6, 7 months later, he had a conversation with a co-employee and mentioned that plaintiff had a guy in Chicago, Casper, who was a well-known Republican in Cook County. So at least in October, we know that he knew. You can infer, I suppose, that he knew in March. But the fact that he knew her political affiliation doesn't mean that his knowledge of that political affiliation had any connection to the posting of the job as, keeping the job, really, as a 2, keeping the vacancy as a 2. Again, it was Director Hamer who made that decision, who was the first person to make that decision. And there's nothing in the record to indicate that Welch could have overruled that decision in any way, although plaintiff repeatedly says that Welch decided to make it a 2. In fact, it was Hamer. That's what the evidence shows. Also, there's, although Crozel, the evidence shows that Crozel had, because she was acting chief of staff, had overall responsibility for hiring and so on, there's no evidence in the record, as the court was asking about, there's no evidence in the record to show that she had any knowledge of Crozel's political affiliation, that Crozel wanted a transfer, or that Crozel was involved in setting the position as a 2. So really, there's nothing in the record to connect Crozel as having any political affiliation discrimination. So can you clarify the role that Welch played in decisions regarding hiring and transfer requests? Well, his role from the evidence, what he did was he filled out the critical request form, critical vacancy request form, which is what starts the process to get the opening posted. This was before. Remember that he did that in mid-March. The vacancy was going to occur at the end of March when Forney retired. And so that was the first step in getting the position filled. Again, Hamer, before that, decided the position should remain a 2 by approving that, the job description for that position. And then Welch, just one week later, started the ball rolling to get that position filled. And there was nothing unusual about that, that he would be the one to get the ball rolling, or was this the first time that happened? No. Well, as far as we know, remember, he came in in January of 07. This is March of 07. He was, as head of the commissions, he supervised, or he was sort of the overall, supervisors may be the wrong word, but he oversaw the Liquor Commission's work. And so he would be the logical person to get the ball rolling for a commission employee's hiring, filling a vacancy that was coming up. And then, as the evidence showed, there was an elaborate system that you would start with an agency, and then the governor's office would approve posting the vacancy, and then there would be the posting, which here didn't happen until October. And then there was an exam, because there was nobody who was exam, who had passed the exam and had a high enough level. And it's your position, it's the state's position, I take it, that she would have had to retake this exam, because she had last done it in 95, is that right? Correct, that's correct. The evidence showed that you get to keep your grade for only one year in here. Now plaintiff, she says that she applied for this, but all she did was she sent a note to her immediate supervisor, Wiset. She also sent, and that was forwarded to Welch, and that was at the end of March. So this is after, this is the first time that the evidence shows that Welch was informed that plaintiff wanted to transfer. This was after Hamer had set it at a two, it was after Welch had issued the critical, started the ball rolling with the critical vacancy request form. So it was not until two weeks after that, that plaintiff sent the note to Wiset, her immediate supervisor. Wiset sent it to his supervisor, who was Welch, and then everybody, you know, eventually knew. Are there data on the breakdown between Republican and Democratic activists in these agent positions? I'm sorry, I didn't hear the beginning of your question. Is there, are there data on Republican versus Democratic activists in agent positions at different times? No, not in the record, no. No, I mean the only evidence of any political affiliation is that Welch was a Democrat. The person who was eventually hired was, for this position at issue, was a Democrat to fill the vacancy. But there's also evidence in the record to show that the first person who was, the person who scored highest on both the interview and the exam was, his political affiliation was not known, and he declined for financial reasons. And then the second person who was a Democrat was hired, but in fact, the evidence also showed that nobody, that her name, and thus her political affiliation, wasn't known until she had been approved by both the department and then the governor's office, the OMB, so the Office of Management and Budget. So there's no evidence of any connection between decisions about employment transfer, this position in particular, and political affiliation. There just is simply none. So what was this back and forth with the Plotner situation, where she's told the vacancy isn't posted, and then it somehow comes back again, and that seemed a little fishy. Well that all occurred afterwards, after this vacancy, but some time, like a year later I think it was, and it's unclear from the record exactly what, well, what is clear from the agency. And then the position wasn't posted, and I inferred from that that it wasn't approved to be posted, that somehow the agency decided they didn't have the money, or they didn't need the position, or so on, and then afterwards they determined that in fact they did need, they had the money, or they needed the position, and so on. And hired him back. And hired him back, right. I mean, he was already a two, there was no question about that, you know. So with regard to the First Amendment, just to sum up, I mean there's really no evidence that Crozel knew plaintiffs, you know, political affiliation, that she knew the plaintiff wanted a transfer, and that she had any direct role in setting the position as a two. With regard to Welch, he arguably knew that plaintiff was a Republican at this time, not just seven months later, but there's no evidence that he, as opposed to Secretary Hamer, set this as, you know, made the initial decision to set this as a two. And so, and thus there's really no causal link between her political affiliation and the decision not to allow her to transfer downstate. With regard to the Fourteenth Amendment, if I can address that quickly, the Fourteenth Amendment claim, a sex discrimination claim, is only against Welch. And it's, plaintiff failed under both the direct and indirect method to show that there was any male employee who had, who was in a similar position, requested a transfer as a one into a two vacancy. And so, there's just simply no causal link between her sex and the decision to, not to make it a two. If there are no further questions? Apparently not. Thank you very much. Thank you. We ask the Court to affirm. Mr. Baker. Thank you. I'd like to address Mr. Welch's involvement. At the time in question, he was the head of the Enforcement Division of the Liquor Control Commission. He reported to Hamer, though, right? He reported to Mr. Hamer, who was the Director of the Department of Revenue in a lot of entities. It's my recollection that in the arbitration proceeding, Mr. Welch took responsibility  is the one that justified the reason for posting it as a two. And as I've indicated earlier, we believe that reasoning is suspect. The Plotner position is a curious position, because it occurred shortly after Ms. Bislick was unable to secure a transfer to Southern Illinois, and at that time, she attempted to go by the rules. The position was posted as a two. She applied for the position. In fact, she filled out the application forms in the personnel office. And shortly after that, she told that the position was not going to be filled. But nonetheless, the vacancy announcement remained on the CMS website. She never got a clear explanation from Ms. Krosel about why it was being removed. And shortly after that, it was awarded to Mr. Plotner. So it seems like the whole business of filling that position is suspect, given that Ms. Bislick was applying for it. With respect to the gender discrimination aspects of the case, Mr. Wyset, who had been Ms. Bislick's supervisor for a number of years, indicated that he supervised two females. And on a continuum, Mr. Welch was highly critical of those two females and wanted Mr. Wyset to discipline them. And Mr. Wyset was kind of baffled by that, because he didn't feel that there was any need for discipline, that they were doing their job acceptably. But here's my problem with this part of the theory. It all sounded so vague, and I wasn't sure whether you were trying to raise a hostile work environment kind of situation. Again, a transfer from one equal position to another under that branch of the law would not be regarded as an adverse employment action. It certainly would be adverse if there were a hostile work environment. But as far as I can tell from your allegations, he's just hopelessly rude to women. And I'm not a fan of that, of course, but it doesn't necessarily violate the law. Well, it was our view, and I take issue with what you judge, we feel that there is sufficient evidence of an adverse employment action. But what did he do? He didn't give her a transfer when he could have. But what about the other woman? The other woman didn't apply, or didn't express interest in a transfer. Right. So it's a little, I don't know, tracing it to her sex is difficult. Well, we know of one male, at least, who was allowed to do the same thing Ms. Bislick wanted to do, and that's Mr. Gottlieb. Transfer from one geographic area to another. He didn't have to go through a formal application process. And as I pointed out earlier, the whole notion of the reason for labeling the position as a two, the justification we believe is suspect. Okay. All right. Thank you very much. Thank you very much. We will take the case under advisement.